# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-3037-19
              A-3038-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

R.W. and M.M.,

      Defendants-Appellants/
      Cross-Respondents,

and

L.S. and J.S.,

      Defendants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF S.W.S.,
J.W.S., M.W-L., Y.W-L. and
Z.W-L., minors,

      Cross-Appellants.

_____

Argued January 24, 2022 – Decided March 3, 2022

Before Judges Accurso, Rose, and Enright.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FG-04-0176-19.

Catherine Reid, Designated Counsel, argued the cause for appellant/cross-respondent M.M. (Joseph E. Krakora, Public Defender, attorney; Catherine Reid, on the briefs).

Bruce P. Lee, Designated Counsel, argued the cause for appellant/cross-respondent R.W. (Joseph E. Krakora, Public Defender, attorney; Bruce P. Lee, on the briefs).

Julie B. Colonna, Deputy Attorney General, argued the cause for respondent (Andrew J. Bruck, Acting Attorney General, attorney; Sookie Bae-Park, Assistant Attorney General, of counsel; Mary L. Harpster, Deputy Attorney General, on the brief).

Melissa R. Vance, Assistant Deputy Public Defender, argued the cause for minors/cross-appellants (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, on the brief).

PER CURIAM

In these consolidated cases, defendants R.W. (Ria) and M.M. (Mark) appeal from the March 11, 2020 final judgment terminating their parental rights

A-3037-19

to their three children, M. W-L. (Mary), Y. W-L. (Yousef), and Z. W-L. (Zack).[1]

Ria also challenges the termination of her parental rights to her teenage daughters, S.W.S. (Sara) and J.W.S. (Julia).[2]

Mark contends the Division of Child Protection and Permanency (Division) failed to satisfy, by clear and convincing evidence, any of the prongs outlined in N.J.S.A. 30:4C:15.1(a) as to him, whereas Ria argues the Division's proofs on the third and fourth statutory prongs were deficient as to her. The Law Guardian also contends the Division failed to satisfy its burden on the third and fourth statutory prongs. We reject these claims and affirm.

I.

Background

The Division became involved with Ria in 2002, and again in 2003, after she was arrested on drug-related charges. The Division removed Ria's two children at that time, and she was substantiated for abuse and neglect. These children were adopted in 2006 and are not at issue in this appeal. Also in April 2006, the Division removed Sara for the first time, based on an incident of

---

[1] We use initials and pseudonyms pursuant to Rule 1:38-3(d)(12).

[2] Sara's and Julia's fathers are not involved in this appeal. The whereabouts of Sara's father is unknown, and Julia's father executed an identified surrender in April 2019.

domestic violence between Ria and Julia's father-to-be. Sara was reunified with her parents two months later.

Ria and Mark never married, but in 2008, when they were expecting a child, the pair requested approval from Mark's parole supervisors to live with Ria and her children. Mark, a registered sex offender under "Megan's Law," N.J.S.A. 2C:7-1 to -23, is subject to community supervision for life (CSL), and prohibited from living with a minor without prior approval by his parole officer. Mark's offender status stems from his pleading guilty in 1998 to endangering the welfare of a child, and admitting he "embraced, attempted to kiss, and grabbed the buttocks" of his eleven-year-old neighbor. Notably, Mark and his sister were also convicted of sexually abusing their five-year-old niece in 1987.

Based on his criminal history and lack of compliance with his parole conditions, Mark's 2008 request to live with Ria's children was denied. Moreover, in March 2013, a parole supervisor banned Mark from contacting Ria after Mark was arrested for theft of Ria's car. Ria also obtained a temporary restraining order against Mark at that time. Shortly after the theft incident, the Division received a referral that Ria's nephew suffered a cigarette burn on his arm while in Ria's care; the nephew reported Ria burned his elbow. Ria's children and nephew were removed, and the Division substantiated Ria for

4

neglect. Ria pled guilty to neglecting her nephew and was placed on probation for a year. After she engaged in therapy, she was reunified with her children in November 2013.

Despite that his parole supervisor banned Mark from contacting Ria, in May 2015, Mark was arrested and incarcerated for assault, based on a domestic violence incident between Mark and Ria. Ria subsequently obtained a final restraining order against Mark.

In November 2015, the Division received a referral that Ria "severely hurt" an eighteen-month-old child, J.B. (Jon), the son of a friend who was living with her. Jon suffered intracranial injuries, bilateral retinal hemorrhages, a liver laceration, and penile bruising during the incident. Moreover, Zack, Yousef, and Mary reported they witnessed the abuse. The Division substantiated Ria for Jon's injuries, and again removed defendants' five children. The boys and girls were placed in separate homes.

On December 1, 2015, the court granted the Division custody of the children, and Ria had a supervised visit with them the same day. The Division also immediately arranged for ongoing family team meetings. Ria's conduct during weekly visits with her children caused concern, as she reportedly became more "authoritarian" with the children and used fear to control them. Moreover,

she refused to change her behavior after being redirected. The children also were observed to be more aggressive with each other.

On December 22, 2015, Mark was released from custody and told by his parole officer "not to have any contact whatsoever" with Ria, due to his pending assault charge. Despite this warning, he attended a visit with Ria at a local Division office that day, and continued to attend weekly visits until the Division became aware of his parole restriction.

In January 2016, the Division placed Zack and Yousef in a new resource home, where they received in-home therapy. That month, Mary alleged her resource parent dragged her down the stairs and choked her. Additionally, Julia and Mary's therapist reported Julia was anxious and depressed, and the two girls needed a more nurturing home. Accordingly, the Division placed the girls in a new home the following month. The new resource parent reported Mary had extensive tantrums and experienced behavioral and learning issues in school.

In or around February 2016, parole learned Mark was in contact with Ria, and he absconded from parole supervision. Nevertheless, the Division provided him with updates about the children by phone. That month, Ria was arrested and charged with second-degree aggravated assault of a child and second-degree child endangerment due to the incident involving Jon. She was released on bail

6

a month later, but the court suspended her visits in March 2016. The Division kept her informed about the children, involved her in family team meetings, and included her in meetings about the children's education and services.

The Division also arranged for in-home therapy, mentors, and behavioral services for the children, oversaw their health assessments, and continued sibling visits. Further, it remained in contact with a care management organization (CMO) which supervised treatment home placements and in-home services. The Division also arranged additional meetings with the CMO worker and Julia and Mary's resource parents. The CMO caseworker believed Sara needed services to help with anxiety, anger, parentification, and controlling behaviors, and Mary needed services for social development, poor self-esteem, poor academic performance, and hyperactivity. Also, Mary was recommended for a child study team evaluation, but Ria declined this service.

Mary subsequently became aggressive with other students at school and was suspended. Accordingly, the trial court ordered Ria to approve intervention and referral services for Mary in November 2016. Later that month, the resource parent for Mary, Julia, and Sara refused to allow Mary into the home due to Mary's behavior. Thus, the Division placed the three girls in the home of a family friend. That family friend later requested the children be removed.

A-3037-19

In March 2017, the court approved therapeutic supervised visits for Ria. She attended a psychological evaluation in May 2017, and that same month, the court denied the Division's goal of adoption, finding the Division had not made reasonable efforts toward reunification. Ria underwent another psychological evaluation in June 2017, and the resulting recommendation was that she have no contact with her children and attend psychiatric and substance abuse evaluations. Her prognosis for change was "poor."

Additionally, the Division referred Mark for individual therapy to address his anger management and parenting issues. He started those services in or around June 2017 but was discharged in October 2017 for failing to attend. He restarted the program the next month, but his attendance was intermittent.

The court approved concurrent goals of adoption and reunification in July 2017, finding it was in the children's best interests to achieve permanency, and the Division had made reasonable efforts toward reunification. Approximately four months later, Ria dismissed the restraining order against Mark, and the court issued an order permitting Mark to have visits. The Division arranged for therapeutic visits between the children and their parents the day after this order was entered.

A-3037-19

The court next approved a reunification plan in January 2018. Around that time, defendants attended psychological evaluations. Mark admitted during his evaluation that he had long-standing mental health issues, and an extensive criminal history that included attempted murder, aggravated sexual assault, kidnapping and unlawful imprisonment. Mark also disclosed he abused illicit drugs. The evaluator concluded reunification was not appropriate, but if it was pursued, reunification should be gradual and closely monitored, with services provided to defendants.

In April 2018, Ria started unsupervised visits with the children, during which she also supervised Mark's contact with the children. The Division continued to coordinate therapeutic services, extracurricular activities, medical care, and family team meetings for defendants' benefit. On June 15, 2018, the trial court approved reunification, conditioned upon Ria obtaining housing, so the Division assisted Ria in locating a home, and provided her first month's rent and security deposit. Ria reunified with the children on June 29, 2018, and the court dismissed the pending litigation approximately ten days later.

## II.

## Current Litigation

A mere three weeks after reunification, the Division learned Ria was arrested for aggravated assault and was incarcerated for throwing rubbing alcohol on another woman and setting her on fire, causing the victim to suffer second-degree burns. The Division also found out the incident occurred on June 28, 2018, just one day before Ria and her children were due to be reunified. A Division investigator went to Ria's home, based on Ria's report the children were home alone, but no one was there. Mark told the Division he did not know where the children were. On August 1, 2018, Ria told the caseworker the children were with her brother. The next day, Mark's parole officer found the children at Ria's home with her brother, and Mark was arrested for having unsupervised contact with minors, based on reports he was alone with the children that day. In fact, Mary confirmed Mark watched her and her siblings by himself.

The Division removed the children a third time, and the court granted the Division custody of the children. The court also ordered defendants to provide names of relative resources. Meanwhile, the jail barred Ria from having in-person visits with the children until she submitted to a psychological evaluation

or obtained a court order for visits, so Ria requested and was granted phone contact with the children.

Mark was released several days after his August 2018 arrest, and initially declined visits with his children. A few months later, Ria made clear to a Division caseworker she did not want Mark visiting with any of the children. By then, Mark was permitted supervised visits and had resumed seeing the children. He subsequently commenced weekly therapeutic visits.

In January 2019, Mark identified G.C. (Gail), the children's paternal grand aunt, as a potential relative placement. Because Gail lived in Syracuse, the Division informed her that her home would need to be assessed based on the Interstate Compact on the Placement of Children (ICPC). The Division completed the request for her assessment in April 2019. It also submitted an ICPC request for a relative in South Carolina, but that relative was ruled out.

On March 28, 2019, the Division filed a complaint for guardianship of all five children. Two months later, Dr. Alan Lee, Psy.D, conducted a psychological evaluation of Ria at the jail to determine if it was appropriate for Ria to visit with her children. Dr. Lee did not recommend reunification or visits.

In July 2019, Ria pled guilty to obstruction, N.J.S.A. 2C:19-1(a), based on the incident involving Jon; she also pled guilty to an amended aggravated

11

assault charge, N.J.S.A. 2C:12-1(b)(7), after attacking a corrections officer. She was sentenced to an aggregate five-year probationary term, conditioned upon the service of 364 days in the county jail.

While Ria was serving her sentence, the Division continued to facilitate contact between defendants and the children, offering therapeutic and office visits for Mark and telephone contact for Ria. Mark cancelled some visits, which disturbed the children. Also, during a visit in January 2020, Mark threatened Yousef with physical discipline; that visit ended early.

Once Ria was released from jail in December 2019, the Division referred her for a psychiatric evaluation and a substance abuse assessment. Further, it arranged for weekly supervised visits to resume five days after her release.

In January 2020, the judge denied Ria's request for unsupervised visits, and specifically directed her visits to include only her and her five youngest children. The judge stressed the restriction was imposed so she could give these children her "undivided attention" and "to think of issues of attunement and judgment." Despite this court order, in January 2020, Ria's adult son and his baby met Ria during a scheduled visit with the five younger children. This violation was reported back to the judge.

III.

Placements

Throughout the course of this case, the Division coordinated various placements for the children. For example, after their removal in August 2018, Sara and Julia were placed in their previous resource home, where Sara remained for the remainder of the litigation, and both girls received in-home therapy. By December 2018, Julia was removed from that resource home and placed with her former mentor. She remained there for a year and was moved to another home in January 2020, where she remained during the trial.

The Division placed Mary in a mentor treatment home where she reportedly did well. She was listed on the honor roll and received recognition for perfect attendance at school. Mary also received therapy for aggressive behavior at school, and her doctor recommended she receive a low dose of Zoloft to control her behavior at school. Defendants initially refused this treatment, but finally consented in January 2020. Mary was moved to another treatment home in March 2020, after her behavior deteriorated.

The Division placed Yousef in a treatment home, and he fared well. After he exhibited behavioral problems at school, defendants agreed to a child study team evaluation. But they subsequently refused to implement the resulting

13

individual education plan (IEP). In 2021, the Division moved Yousef to the home of Mark's aunt, Gail, where he remains.

Zack was initially placed with Sara and Julia, but the Division moved him to a treatment home after he became "aggressive" and "destructive." He started the Children Are Really Extra Special (CARES) program at a local facility in November 2018, and two months later, CARES recommended medication for him due to his behavioral issues. Defendants refused to consent to Zack being medicated, and because Zack was not permitted to return to CARES without medication, he was placed on home instruction. Over defendants' objection, the Division successfully moved to have Zack evaluated by a child study team and defendants eventually signed the resulting IEP in court.

Zack was placed in a new treatment home in July 2019, because his resource parents used corporal punishment on their own children. A few months later, following a sibling visit, Zack was taken to the hospital due to his uncontrollable behavior; he was taken back to the hospital the next day after throwing stones at his resource parents. The resource parents refused to take Zack back. Therefore, he was placed temporarily in an Emergency Diagnostic Reception Unit (EDRU), and then in a new treatment home in November 2019. He was returned to the EDRU three days later. Despite his behavioral issues,

14

Ria insisted Zack just needed a "whooping," and defendants again refused to allow Zack to receive medication for his issues. By January 2020, Ria finally agreed to Zack being medicated, and the judge authorized medication for Zack over Mark's objection. Zack was placed in another treatment home, where he remained during the trial.

IV.

The Guardianship Trial

The guardianship trial was conducted over sixteen days from September 2019 to February 2020. The Division called Ougeri Baptiste, an adoption worker; Rose Jensen, Division casework supervisor; and Linda R. Jeffrey, Ph.D., an expert witness, to testify. The Law Guardian called Sara and Julia as witnesses, and the girls testified in chambers on the record. Ria did not present any expert reports or expert testimony but testified on her own behalf. Further, Mark testified and had Dr. Harry Green testify on his behalf.

Baptiste testified he became involved with the family in April 2019. He stated that when he first became involved in the case, Mark was not willing to be reunified with the children, nor did Mark ever say he wanted to be reunified or serve as the children's primary caretaker. Baptiste also recalled Mark cancelled visits with the children if he had concerns about the weather. After

15

one such cancellation, Zack "had one of his more aggressive episodes" in his group home.

During his testimony, Baptiste described each child, as well as their interests. Based on his interactions with them, he believed all five children could be adopted, noting they had "wonderful qualities." He added, "once their behavior is under control, the kids . . . can be adopted."

Baptiste also testified it was the Division's plan to "look for a home for all of the children together." He confirmed the Division was assessing the possibility of Gail, Mark's aunt in New York, as a placement for all five children. Also, he acknowledged the previous caseworker received Gail's information, "maybe sometime in February" 2019, and Gail was willing to take the children. Further, Baptiste stated the formal process through ICPC began in approximately May 2019 and was ongoing. He advised the ICPC process is for permanent placements only and the Division usually introduces the children to a potential placement after background checks are cleared, but that process was not yet completed by the ICPC. He did not have a timeframe for when it might be finished, noting it is a "very lengthy process."

Baptiste also stated that because some of the children were in treatment homes, Gail was required to secure a treatment home license through a private

agency in New York. He testified that to accomplish this, the Division had to contract with a private agency in New York to get Gail's home licensed, and the Division was pursuing that option.

Jensen, the Division's casework supervisor, testified that after a child becomes "legally free," the number of potential homes for that child increases because the Division can undertake a national search for homes. She confirmed parents who participate in this search have received extensive training, are only willing to take children who are legally free, and are aware the children likely will have behavioral issues. Also, she stated the Division had identified multiple adoptive homes in New Jersey and would focus on homes willing to accept sibling groups or facilitate sibling contact. Jensen echoed Baptiste's sentiment that the children had a good chance of being adopted because they were likable and had "a lot of great qualities."

Dr. Jeffrey testified about the results of her psychological and bonding evaluations of defendants and their respective children. She stated that during her evaluations, she administered psychological testing and formulated diagnostic impressions based on a "clean slate," explaining that she collected her own data, and did not initially review documents from other evaluations

17

because she hoped to avoid "confirmation bias." The parties stipulated to her expertise in clinical and forensic psychology.

According to Dr. Jeffrey, Ria scored in the "clinical range" for antisocial behaviors, had a "super high score" for traumatic stress, and elevated scores for egocentricity, negative relationships, and stress. These scores reflected her problems with aggression, her struggle to act lawfully, and the difficulty she faced in governing her behavior. Dr. Jeffrey found Ria's egocentricity and lack of empathy stunted her ability to build a secure attachment with her children and made it difficult for her to make therapeutic changes or understand the impact of her behavior on others. Dr. Jeffrey also noted Ria's desire not to co-parent with anyone if the children were returned to her.

Dr. Jeffrey concluded Ria "was not prepared to provide a minimal level of safe parenting" and "[t]hat places the child[ren] at risk for harm." The doctor also stressed that a minimal level of parenting "doesn't mean that it's optimal parenting. . . . It's what is required of a . . . responsible parent." Dr. Jeffrey further opined Ria had "significant unresolved characterological problems . . . and . . . a record with these children of acting in such a way as to place them at risk of harm and of creating unstable situations for them."

18

Turning to Mark, Dr. Jeffrey noted that some of his responses during the evaluation were inconsistent with certain responses Ria gave. For example, Ria stated she experienced abuse in her relationship with Mark and had obtained a temporary and permanent restraining order against him, whereas Mark claimed he "never engaged in physical fighting with partners" and "never abused a partner." He also stated he expected Ria to be the children's caretaker in the future, and he planned to co-parent with her, whereas Ria made clear to Dr. Jeffrey she would not co-parent with him.

During his evaluation, Mark disclosed his belief that the children's academic and emotional problems were "attribut[able] to their being placed in the care of the Division." Also, he acknowledged he attempted suicide and was admitted to a psychiatric hospital in 2008, and previously was convicted of "[r]obbery, assault, sexual assault, child endangerment, resisting arrest, [and] simple assault." Further, he revealed a history of drug use that included "marijuana, cocaine, [and] PCP," and admitted he "sold drugs." Mark also conceded he did not have housing approved by the Division.

Dr. Jeffrey found Mark "had a high probability of substance use disorder," scored in the "clinical range" for antisocial behavior, dominance, and grandiosity, and was not "reflecting insight into his mental status." She

19

confirmed Mark's Megan's Law violation was only one factor in her assessment. Further, she stated he had difficulty modeling rule-governed behavior and his "high scores in strategic areas of . . . personality functioning . . . . becomes very relevant with parenting." Pointing to Mark's "very high scale score" for narcissistic features, she stated:

> [t]he ability to be attuned to children requires that you have empathy. And if your narcissism is highly elevated, you are much less likely to be able to show empathy. Attunement is like a higher order form of empathy, and it's essential that you be able to be empathetic if you're going to . . . parent. So, the fact that he had a high score on anti-social [behavior] would suggest problems in terms of role modeling rule-governed behavior. And then problems in terms of his grandiosity would suggest that he had difficulties in terms of narcissism that would be problematic.

Dr. Jeffrey opined Mark displayed "poor insight and poor judgment," and "his adjustment disorder included multifaceted aspects of . . . . adjustment, including housing problems, employment problems, financial problems, negative relationships, problems with the law and incarceration." She further concluded his "serious unresolved adjustment, personality, and substance use disorders . . . negatively affect parenting capacity" and "these are enduring issues . . . that are not . . . easily treated." She concluded Mark, like Ria, was "not prepared for a minimal level of safe parenting."

20

Dr. Jeffrey separately addressed the report Mark produced from Dr. Green. She found his report: did not include information about Dr. Green's underlying data; did not address Mark's parenting capacity; and lacked clarity as to how Dr. Green assessed Mark's risk of sexually reoffending. Dr. Jeffrey also confirmed Dr. Green's report did not alter her assessment of Mark.

When addressing the bonding evaluations conducted between defendants and their children, Dr. Jeffrey first discussed the importance of attachment. She explained a "child's attachment to a parent or parent figure provides the foundation for the child's development in multiple domains. It's absolutely essential." On the other hand, she confirmed an "insecure attachment" a child might form toward a parent or parent figure is "filled with instability and a lack of security," and can be "quite destructive." She stated there are "long-term consequences if a child has an insecure attachment. It's correlated with a lot of different mental health and behavioral problems," as well as "delinquency and domestic violence." Dr. Jeffrey testified that "all of the children had insecure attachments" with Ria and "did not relate to her as a reliable source of safety, stability, security," despite their "affectionate tie toward her."

Ria's bonding evaluation occurred in August 2019. By then, it had been more than a year since the children had seen their mother in person, given her

21

A-3037-19

ongoing incarceration.  Dr. Jeffrey described the meeting as "chaotic," with the children yelling over each other and seeking Ria's attention.  The children spoke loudly and when Dr. Jeffrey asked Ria to have them lower their volume, Ria complied, but the children did not adjust their behavior.  Dr. Jeffrey observed that Ria's difficulty in establishing "structure" for the children was "a significant issue" as the children were "not responding to her parenting authority," which "is part of attachment."  Dr. Jeffrey added that "having a sense of structure and organization is really important to these children.  They have some behavioral challenges."

Dr. Jeffrey further opined that the children's need to vie for Ria's attention could create conflict between them and foster a sense of frustration.  Dr. Jeffrey clarified that because this was the first time the children had seen their mother in quite some time, their excitement at seeing her was not problematic; rather, the issue was the "lack of structure and [that] the interaction among them was competitive to talk over each other, and it was chaotic."  Dr. Jeffrey further noted that twice during the evaluation, Ria told the children she wanted them to write a letter to the judge about what they wanted, but "they did not make any move to write letters."  Ria also announced during the evaluation that she was "moving to New York City," to which Yousef responded, "You're going to get locked up.

22

I can see the cops." Dr. Jeffrey found this to be an "atypical response" from a child but concluded that it "reflects . . . a family history." Dr. Jeffrey also found disconcerting that when Mary tried on Ria's correctional facility shoes, Ria did not engage in a conversation with Mary about her incarceration. Dr. Jeffrey stressed that a parent would "not want[] to normalize incarceration for children."

Ria acknowledged to Dr. Jeffrey that four of her five children (ages eight to thirteen) were displaying enuresis. She also described them as "rule breaking" and doing poorly in school, a concern for Dr. Jeffrey, considering Ria did not prioritize structure for them. Dr. Jeffrey also determined Ria's perception of the children was skewed in certain instances. For example, Ria described Yousef as a child who "can't sit still, [and was] restless or hyperactive," yet when Dr. Jeffrey tested Yousef, he was neither hyperactive nor restless and "scored in the above-average range of . . . intellect." The doctor described Yousef as a "very cooperative and a reasonable kid." Overall, Dr. Jeffrey was struck by the "similarity of the problems" Ria identified for her children and Ria's "expectation that these behaviors [would] decrease when the children c[a]me home." Dr. Jeffrey also expressed concern that "there wasn't a pattern in [Ria's] responses to her children of empathy and then deeper interaction."

23

Following Mark's bonding evaluation with his three children, Dr. Jeffrey concluded the children were "insecurely attached to him." She also observed that during this evaluation, the communications between the children were "relatively harsh," yet Mark remained "relatively passive," and "watched their interactions" during the session, rather than engage with or direct them. Also, although Yousef hugged Mark, Dr. Jeffrey noted "[t]here wasn't a lot of spontaneous affection otherwise being shown." As Mark did not bring snacks or toys to the session, she also observed that when the children asked for food, they were "out of sorts" to find out Mark "had not brought snacks."

After evaluating the children individually, Dr. Jeffrey found each child was "quite obviously in significant need of permanency." She explained, "[p]ermanency is having resolution about where a child is going to be and who that child is going to be with." She highlighted that the children had been in numerous placements and diagnosed with "serious emotion issues," so they were "in need of stability with attuned, mature caregivers who can address their needs." Dr. Jeffrey further opined:

> the problems that these children have now are linked to
> a number of the problems that the parents have
> displayed. And the . . . necessity for the children to be
> given role models where those behaviors are not present
> is great. It is extremely important that the children have

access to stable, emotionally mature, rule-governed, conscientious, responsible parents, parent figures.

Significantly, Dr. Jeffrey also concluded that severance of the insecure attachments the children had with their parents would not cause them "serious and enduring harm." She reasoned, "[s]erious and enduring harm is associated with the severance of a secure attachment," but "insecure attachments in and of themselves place a child at risk for serious and enduring harm because insecure attachments teach children a very unhealthy understanding of human relatedness."

Dr. Jeffrey also evaluated the children for "permanency planning." Based on her assessment, she diagnosed Sara, then thirteen, with a "parent-child relational problem; . . . the victim of child neglect; multiple episodes of placement outside the home; enuresis; [and] an adjustment disorder with the specific issues of academic problems." The doctor recommended that Sara engage in individual counseling "to help facilitate her identifying any causes of academic problems and her risk of parentification." Further, the doctor opined Sara "needs to have access to caregivers who are emotionally mature, who are functioning at an adult level of responsibility, who are rule-governed, lawful, able to guide her."

25

Dr. Jeffrey found twelve-year-old Julia "scored very high in personal confidence and abilities," but showed "a fundamental emotional immaturity." Dr. Jeffrey recommended Julia receive individual counseling "to address issues of anxiety, aggression, conflict resolution, and peer group problems." Moreover, the doctor determined Julia's permanency needs included "attentive nurturance and guidance by reliable, emotionally-mature caregivers who can role model non-violent conflict resolution, appropriate anger and other emotional control and management."

When assessing Mary, Dr. Jeffrey found the sixth grader "display[ed] a mixture of neediness for nurturance and defiant self-assertion," and "impulsive emotionality characterized by negativism, sullen pouting, fault finding, [and] stubbornness." But she noted Mary "has a really promising mind." Dr. Jeffrey stated Mary "often behaves in an unruly and bullying, obstructive manner as a defense mechanism . . . against being disappointed in people." She recommended Mary receive "intensive counseling for . . . interpersonal problems," and concluded Mary needed role models "who are self-reliant, . . . follow the law, . . . and are . . . empowered to focus on the needs of the child and to put those needs before the adult's."

A-3037-19

Regarding Yousef, Dr. Jeffrey observed that this ten-year-old's "intellectual testing was very hopeful" and his score was "in the above-average range." She concluded he "really has terrific intellectual possibilities." Still, Yousef had issues like his siblings "in terms of parent-child problems," and he had been subjected to neglect and "multiple placements." She found Yousef was "very conscious [about] how many placements he's been in." She further determined he has "some fighting and anger problems" and experiences "nocturnal enuresis," all of which "need to be dealt with." Dr. Jeffrey concluded Yousef needed "attuned care by mature caregivers."

Lastly, in describing eight-year-old Zack, Dr. Jeffrey stated his "I.Q. test . . . . [was] in the below-average range," but "kids can change [thirty] points in I.Q., so one should not assign an identity to him based on [his] I.Q. score." She believed his "IEP was very good from his school district." Dr. Jeffrey diagnosed Zack with "parent-child relational problem, child neglect, history of multiple placements, adjustment disorder, with mixed disturbance of emotions and conduct." She also concluded, "of all of the children, he is probably the child who has been most severely affected by the past years of his life." She noted Zack was "not displaying age-appropriate socialization," and had "severe problems in terms of his behavior." However, his most recent reports from

27

school were positive so there was potential for him "to come around" and he "should not be viewed as incorrigible." She opined Zack "really needs a stable situation where he gets attentive, focused, nurturing and guidance," and "caregivers who can implement a treatment plan."

Considering her assessment of the children's respective issues and needs, Dr. Jeffrey opined each child required "more than a minimal level of safe parenting." Although she found Sara and Julia to be "the most functional," Dr. Jeffrey noted they required

> more than the minimal level of safe parenting because adolescence is going to be very hard for them because they have a history of a lack of permanency in their life, and children bring that history along with them. So, they . . . have had experiences in their young lives that means they need more than [a] minimal level of safe parenting.

Based on "the empirical evidence that's in [defendants'] psychological evaluations," Dr. Jeffrey reiterated that defendants "were not prepared to provide a minimal level of safe parenting."

Sara and Julia provided testimony in chambers about their wishes. Sara testified she wanted to return home, to be with her "siblings and [her] mom," and did not want to be adopted "because [she] want[ed] to go home." Similarly, Julia stated she wanted to "be home" "with [her] mom and all [her] siblings."

28

Asked if she would want "another forever home" if she could not return home, Julia responded, "No." But Julia explained she gave this response because of her desire to be with her mother.

During Ria's testimony, she confirmed that when her August 2018 arrest was imminent, she arranged for a relative to care for the children for "as long as necessary." She also testified that while she was incarcerated, she spoke with the children daily and stayed in touch with their resource parents. Ria acknowledged that while she was in jail, the Division asked her to participate in certain services, so she engaged in anger management treatment and submitted to a psychiatric evaluation. When asked about her housing plans, Ria testified she had a plan "to move into a place" with the children if they were returned to her. She offered no specifics about where she intended to live but maintained she "could get housing tomorrow if necessary."

Mark testified that after Ria was arrested and the children were removed in 2018, he still wanted the children returned to Ria's care. In describing Ria's parenting skills, Mark stated she "can tolerate children to the point where most people can't." He added, "I know I can't. They get on my nerves. Too many at one time . . . . But [Ria] do[es]n't have that issue." Mark also testified that if the children could not be returned to Ria's care, he was "making plans in case

A-3037-19

. . . [he] was to get the children."  Mark stated he spoke with the Division about his interest in "having [the] children," but the Division did not ask him to do a "living with children" assessment.[3]

Mark confirmed he provided contact information to the Division for alternative placements for the children.  He noted he submitted the names of his brother in Florida, "family, friends in the Carolinas," "two aunts in New York and . . . an aunt in New Jersey."  On cross examination, Mark admitted that at least some of the children were previously placed with his aunt in New Jersey and needed to be removed from her home.  He also acknowledged the children had no contact with his brother since 2010, and no contact with one of his aunts from New York since 2011.  While Mark remained under cross examination and testified about placement options, his attorney conceded he would not argue about "anybody but [Gail] in terms of the Division assessing relatives."

Mark admitted during his testimony that he became subject to CSL in 1994 and "had some violations" while on CSL, but the violations did "[n]ot always" result in his incarceration.  He stated he was last incarcerated for a parole

---

[3]  The record reflects a "living with children" evaluation is used to assess the risk a convicted sex offender would pose if allowed to live with children.

violation in 2015.  He also steadfastly denied he violated CSL by being alone with the children shortly before their removal in August 2018.

Mark testified about his efforts to lift the parole restrictions barring him from living with his children.  It was his understanding that to eliminate such restrictions, he had to undergo a living with children assessment and then seek final approval from parole to live with his children.  Mark also understood he could be relieved from CSL "[i]f appropriate courts authorize[d] it" and "then [he] could have the kids."  While Mark acknowledged he could "make application to the court instead of parole to have [his] community supervision lifted" he did not state he filed such an application.

When Mark called Dr. Green to testify, the parties stipulated to the doctor's expertise in clinical and forensic psychology.  However, after finding there was "absolutely nothing" in Dr. Green's report "with regard to [whether] it [was] safe for [Mark] to parent," and noting the expert's report was limited to Mark's "risk factors with respect to risk for reoffending," the judge barred Dr. Green from testifying about Mark's parenting abilities.

Dr. Green acknowledged his evaluation focused on Mark's potential to live with a child, so he assessed Mark's risk of committing sexual abuse, and did not assess his parenting capacity.  Dr. Green also confirmed he did not review

31

Mark's prior psychological or psychiatric records and did not perform any psychological testing on Mark or the children. Instead, Dr. Green reviewed "discovery," including certain parole records, and considered Mark's self-reporting. He did not review Dr. Jeffrey's report until he completed his own.

Dr. Green opined Mark was at low risk for sexually abusing children and could safely live with them. Also, after he conducted a bonding evaluation between Mark, Mary and Zach (Yousef was not present for the bonding evaluation), Dr. Green concluded Mark's bond with Mary and Zach was "generally secure" and healthy. While he found Mark's existing function was "at least minimally adequate to provide safe and effective parenting," Dr. Green acknowledged Mark had not secured housing at the time of his assessment, so there did "not appear to be a prudent alternative" to the termination plan proposed by the Division. Dr. Green further stated he could not "speak to the . . . adequacy of [Mark's] present plan with regard to the children, given several variables which are presently unknown." Nevertheless, the doctor opined that if Mark was "able to secure housing and . . . permitted to live with the children, reunification [was] possible." In the event reunification occurred, Dr. Green opined Mark would "likely benefit from further participation in a parent education program."

32

## V.

## The March 11, 2020 Decision

On March 11, 2020, the trial judge rendered a comprehensive oral opinion, concluding defendants' parental rights should be terminated. She assessed the testimony of the witnesses and found Baptiste was "honest, forthcoming, credible, and . . . truthful." She further concluded he was "very knowledgeable" and "testified almost entirely from memory." The judge found Baptiste was "invested in these children," understood the children's issues and "good qualities," and was "very positive towards them." Similarly, the judge found Jensen to "be very knowledgeable" about the select home process.

Turning to Dr. Jeffrey's testimony, the judge found it to be "clear, candid, and credible." She observed this expert's "testing and research was reasonably relied upon by experts in the field." Additionally, the judge concluded Dr. Jeffery "provided explanations that were logical, insightful, [and] helpful," and her assessment of defendants was "consistent . . . with [the court's] observations of the defendants."

Regarding Dr. Green's testimony, the judge found he only addressed whether Mark would present a safety risk to the children but did not provide a "psychologically supported analysis of [Mark's] parenting capacity." The judge

A-3037-19

declined to give weight to Dr. Green's report because it contained errors resulting from Mark's "lack of candor in reporting." When comparing Dr. Jeffrey's evaluation to Dr. Green's, the judge found Dr. Jeffrey applied "the recognized standards and procedures used by psychologists in the profession," whereas "the purpose of [Dr. Green's] report had a completely different focus" which was "not insightful, not helpful, and not probative of the issue before the court."

The judge also discussed her in camera interviews with Sara and Julia, noting Sara was reticent and made no eye contact with her, but Julia was "articulate and engaging." The judge found Sara's statements sounded "coached" "because they were exactly the same statements [the court] got from Julia." In fact, both girls stated they wanted "to go home to Mom and [their] siblings." The judge noted Sara was removed from her mother four times, and the other children were removed three times. She estimated the total time the children were in placements was about five years.

When addressing the likelihood of defendants improving their behavior in the future for the benefit of their children, the judge pointed out that toward the end of the trial, Ria "flagrantly disobey[ed]" the judge's order denying Ria's request to include her older children in an upcoming visit with the five younger

children. The judge recalled explaining to Ria "[t]he importance [of] working on individualized attention" for the five younger children, and her order "[c]ould not [have] be[en] clearer." The judge found that "despite all the services that have been provided, . . . all the attempts to teach her to follow rule-governed behavior," Ria violated the order. By the same token, the judge observed that Mark had the benefit of therapeutic facilitators who wanted to work with him on his parenting skills and his communication, yet "Dad's attitude was . . . they just wanted me to play board games." The judge found this was "illustrative of a . . . lack of attunement, and a lack of understanding of what was provided to him, and a lack of an ability to engage."

Next, the judge addressed whether the Division satisfied the four-prong test under N.J.S.A. 30:4C-15.1(a).

### 1. The First Prong

Initially, the judge concluded the Division proved by clear and convincing evidence "that the children's safety, health, or development has been or will continue to be endangered by the parental relationship." The judge summarized Ria's history with the Division and detailed the circumstances leading to the children's removal from her care on multiple occasions. For example, the judge pointed to the 2013 Division referral involving Ria's nephew being burned while

in Ria's care. Further, the judge noted Ria was substantiated for neglect, and at a 2016 fact-finding trial, Ria was found to have inflicted serious bodily injury on her friend's eighteen-month-old son. Additionally, the judge referred to the June 2018 incident when "mom threw rubbing alcohol on her paramour . . . and set her on fire, causing second-degree burns." The judge found this event demonstrated Ria was "unable to control her impulsive, violent behavior, or exhibit rule-governed behavior in the face of imminent reunification" with her five children. Further, the judge observed that in response to Division reports that she hit the children, Ria admitted the children "[g]et their hind parts popped," and asserted others should not tell her how to discipline the children, that the family "just play[ed] rough." Similarly, the judge noted Ria's "answer" to Zack's "significant emotional and behavioral problems" was "he just needs a whooping." Moreover, the judge found Ria had "significant areas of dysfunction as a parent," and a "history of unstable relationships." She concluded that after "years of services," Ria still exhibited a "complete lack of attunement to the needs of these five children whose lives have already been significantly disrupted."

When considering the Division's burden on the first statutory prong as to Mark, the judge noted that after Ria was arrested in 2018, Mark's parole officer

"violated Dad" because "Mom's brother reported he and Dad were taking shifts in caring for the five children in the home" and Ria's brother further reported, "Dad sleeps over with them at night." The judge found Mark was "not permitted to reside with the children or care for them unsupervised," yet Mary had reported her father "watched her and [her] siblings by himself during the week." Additionally, the judge noted Mark admitted to illicit drug use and repeatedly tested positive for illicit drugs while on CSL. She also found "Dad never cooperated throughout . . . in IEPs or medication recommended by the professionals to help the children deal with their significant behavioral, emotional, and other problems, so . . . they could focus in school, focus in the resource homes."

Further, the judge observed Mark was a Megan's Law offender, having committed two serious offenses, and that while on parole, he went "missing . . . several times," violated curfews and failed to disclose to parole when he was arrested on a warrant. The judge also referenced Mark's admission to "driving regularly without a license," and his 2003 arrest for being at Ria's home, in violation of a special parole condition. Additionally, the judge credited reports Mark was abusive to Ria and had threatened his children with physical abuse during two Division visits.

A-3037-19

Based on these findings, the judge found the Division proved the first statutory prong under N.J.S.A. 30:4C-15.1.

2.  The Second Prong

Similarly, the judge found the Division met its burden in establishing the second statutory prong under N.J.S.A. 30:4C-15.1, i.e., defendants were unwilling or unable to eliminate the harm facing their children or provide them with a stable home.  The judge cited Dr. Jeffrey's testimony about Ria's reports that she experienced periods of incarceration based on "a long pattern of breaking the law," and incurred numerous drug charges and offenses that hurt others, such as "neglect, aggravated assault, receiving stolen property, [and] distribution."  Moreover, the judge credited Dr. Jeffrey's testimony that Ria demonstrated "absolutely no attunement" with her children.  Likewise, the judge credited Dr. Jeffrey's assessment that Ria, at age thirty-seven, had her children removed multiple times, "for significant periods of times" but these experiences "did not motivate a change in" Ria and it was "unlikely that she will change this time."

The judge emphasized, too, that Ria "engaged in unlawful behavior right before reunification" in 2018, and assaulted a corrections officer in 2019, evidencing her "aggressive, violent behavior" and "impulsivity," despite having

received services from the Division for years. Accordingly, the judge accepted Dr. Jeffrey's conclusion that, "within a reasonable degree of psychological certainty, . . . [Ria] was not prepared to provide a minimal level of safe parenting for her children [and] would have difficulty establishing a safe parenting environment" for them. She also concurred with Dr. Jeffrey's assessment that the children "would likely be at risk for harm if placed in her care," and that it was "not safe to return any of her children to her care."

Similarly, the judge relied on Dr. Jeffrey's evaluation to find Mark was unwilling or unable to eliminate the harm facing his children or provide them with a stable home. She credited Dr. Jeffrey's assessment that Mark did not "display consistent parenting authority" or structure for the children, and "was not prepared to serve as an appropriate role model of emotional maturity, an adult sense of responsibility, or non-violent conflict resolution."

The judge also referenced Mark's lack of candor to Dr. Green, stating "the credibility of a parent is very important in role modeling." She noted Mark told Dr. Green his last parole violation was in 2015, yet that representation was "not accurate, because he was violated on August 2, 2018" for being alone with the children after Ria's arrest. Further, she found Mark was "not truthful" about his psychiatric history, and "wasn't necessarily honest," as he "denied a [domestic

violence incident] with [Ria]." He also "didn't include his entire criminal history." The judge accepted Dr. Jeffrey's conclusion that based on psychological testing, Mark's "clinical profile" showed he "has serious unresolved adjustment, personality and substance abuse disorders that negatively affect his parenting capacity," and lacked "real dedication to personal change."

Thus, the judge concluded the Division satisfied the second statutory prong, and found the children would not only be at risk if reunified with their parents, but they had insecure attachments to defendants.

### 3. The Third Prong

Next, the judge determined the Division "made reasonable efforts to provide services to help . . . each of the parents correct circumstances which led to the children's placement outside the home," and the Division considered alternatives to termination.

#### a. Reasonable Efforts to Provide Services

The judge found while Ria was in jail from July 2018 until December 2019, Division caseworkers continuously called the local prosecutor's office to check on the status of her case, had Ria participate in family team meetings and treatment programs, facilitated phone calls between her and her children, and

kept Ria "in the loop." While the judge acknowledged the Division's actions were not always "perfect," and the court "would have liked to have seen some more follow-up," the Division did not ignore Ria or her family while Ria was in jail. Instead, the judge found defendants were informed each time the children were moved to a placement, Baptiste visited Ria in jail, and he gave her the children's contact information when their placements changed. Additionally, the judge noted Baptiste engaged in numerous conversations with Ria about Zack's and Mary's behavior, particularly when they were recommended to receive medication for their behavioral issues. Additionally, the judge concluded the Division facilitated supervised and therapeutic visits.

Regarding services offered to Mark, the judge found Division workers engaged with him so he could learn parenting and communication skills, and they worked with him on "interpersonal skills," offering constructive criticism, as well as praise when he appropriately responded to a child.

Separately, the judge addressed Mark's contention the Division failed to satisfy the third prong, in part, because it failed to schedule a living with children evaluation to advance his bid to have unsupervised contact with his children. Citing N.J.A.C. 10A:72-2.5 and 10A:72-2.6, the judge noted these regulations call for a parent or legal guardian of a minor child at issue, in this case, Ria, "to

provide to the District Parole Office a written statement requesting that the offender be permitted to reside with the minor child" or be allowed to "initiate, establish, or maintain unsupervised contact with a minor child," before the Parole Board could consider granting the offender living with children privileges. The judge also pointed out that Dr. Green admitted his evaluation was "akin to a living with children investigation," and "the Division did cooperate" with Mark when a living with children evaluation was proposed at a case management conference. Still, when "the question was posed . . . of Mom[,] . . . [she] steadfastly refused to sign the appropriate letter." Not only did Ria "decline[] to provide written consent on a living with children form [for] the assessment [Mark] had completed [with] defense counsel," but Ria "was adamant about not wanting [Mark] to have contact with [Sara and Julia], definitely didn't want the children to live with him, wouldn't sign anything, and made rather disparaging comments about him."

The judge further credited the testimony of Baptiste when he stated he understood a certain procedure had to be followed to lift Mark's restrictions. Baptiste explained a living with children evaluation had to be conducted and submitted to the Parole Board for approval, but Ria had to "sign off as the parent of these children." Yet Ria "vehemently stated on the record that she was not

42

signing off for anything." Considering Ria's unwavering refusal to sign off on the necessary documentation for a living with children evaluation after this case began, the judge found if the Division sought to obtain its "own living with children evaluation[, it] would not have served any purpose." Further, the judge concluded it "was not appropriate [for Mark] . . . to request [this evaluation] in a summation [because t]here was never an application made."

Next, the judge turned to Mark's contention a Family Part judge could modify his CSL restrictions. She noted this argument was "never requested by application or otherwise," but only argued in summation. The judge explained Mark could have petitioned a "Megan's Law Court" to release him from his CSL obligations but he would need to satisfy the two-pronged test under N.J.S.A. 2C:43-6.4(c), meaning he would have to submit "proof by clear and convincing evidence that [he] has not committed a crime for [fifteen] years . . . since the last conviction or release from incarceration," whichever is later, and that he was "not likely to pose a threat to the safety of others." The judge further stated she was "not the appropriate court . . . to modify" defendant's CSL conditions.

Given her findings, the judge was persuaded the Division "clearly satisfied its burden of making reasonable efforts to provide services to each of the parents to correct the circumstances which led to the placement outside the home."

A-3037-19

b. <u>Alternatives to Termination</u>

Likewise, the judge determined the Division satisfied by clear and convincing evidence that it considered alternatives to the termination of defendants' parental rights. Acknowledging that in "a perfect world," there would have been "some follow-up letters, or notations in the file, from August 2019," or status updates regarding Gail, the judge credited Baptiste's testimony and found the Division "did move on this process as expeditiously as possible." Further, the judge concluded the "Division explored a variety of ICPCs" and "ruled out other people," leaving Gail as the one viable option for placement. Although the judge found Gail's assessment could have been completed more quickly, she credited Baptiste's testimony that the Division had "to go through a lot of different steps" because there were five children involved, "with a lot of information, a lot of placements, a lot of things going on."

Additionally, the judge determined the proofs demonstrated "New York ICPC requested and required Level of Care assessments . . . concerning the three youngest [children] in treatment homes" and because "New York doesn't do it — they require the Division to have to contract to get it done, . . . . the Division did proceed with it." Therefore, the judge declined to find the Division "dropped the ball with respect to that." Further, the judge accepted the

44

Division's rationale for not placing the two older children in Gail's care during the litigation. Although defendants argued this placement should have been considered, the judge found the Division's reasons for not relocating Sara and Julia to Gail's residence sound, explaining that arranging visits with the older children in Syracuse, a destination approximately "four hours away . . . in good traffic. . . . would have been a logistical nightmare" and it would not have been "practical" for all parties concerned. Thus, the judge concluded there were "no alternatives to termination of parental rights under the circumstances and . . . these children are entitled to the next step of being made legally free." The judge found this result was warranted "particularly in view of the length of time that the children have been in placement, and the number of placements" they endured, even though the children "don't want it."

4. The Fourth Prong

Finally, the judge addressed the fourth statutory prong under N.J.S.A. 30:4C-15.1(a), mindful "there [was] no adoptive home on the horizon" for the children. The judge concluded the Division had "clearly demonstrated that termination of parental rights will not do more harm than good to each of the children." She credited Dr. Jeffrey's opinion that while there was "an affectionate tie" between defendants and their children, there was no "secure

bond, and an insecure bond, in and of itself, is harmful." The judge also cited Dr. Jeffrey's assessments and the "extensive testimony" by Jensen and Baptiste about the process to be followed to find "forever homes." The judge concluded that by "making these children legally free, the scope of homes available are expanded." Significantly, the judge further credited the testimony of Baptiste and Jensen that the children were "adoptable."

Based on these findings, the judge concluded the Division satisfied its burden under N.J.S.A. 30:4C-15.1(a), and she terminated defendants' parental rights. Defendants moved for a stay pending appeal and asked to continue visits with the children. The judge denied their application but permitted one final visit. She also entered a conforming guardianship judgment on March 11, 2020.[4]

VI.

The Appeal and Cross-Appeal

Mark argues the trial court erred by finding the Division satisfied any of the prongs under N.J.S.A. 30:4C-15.1(a) as to him, whereas Ria contends the

_____

[4] Pursuant to Rule 2:6-11(f), after entry of the guardianship judgment, the Division provided us with updates on the children's post-trial placements. We deem it unnecessary to itemize these placements, given our conclusion the judge was fully aware the children had a history of multiple placements and "there [was] no adoptive home on the horizon" for any child when she terminated defendants' parental rights.

judge erred in finding the Division satisfied its burden under the third and fourth statutory prongs as to her. The Law Guardian cross-appeals from the guardianship judgment, echoing Ria's claim the Division failed to establish the third and fourth prongs. Notably, Ria specifically contends the judge erred "by failing to consider independent living as an alternative to termination"; the Law Guardian joins in this argument as to the two older girls. Finally, Ria argues the judge violated her first amendment right to freedom of speech by relying on statements Ria made to her children as a basis for termination.

We find Mark's arguments regarding prong one and Ria's free speech argument lack merit and do not warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). Moreover, we find the balance of the parties' arguments unavailing, and add the following comments.

The standards guiding our review of the parties' arguments are well established. "We will not disturb the family court's decision to terminate parental rights when there is substantial credible evidence in the record to support the court's findings." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (citing In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). This is so because the judge has the opportunity to see and hear the witnesses as they testify, thereby developing a "'feel of the case' that can never be realized

47

by a review of the cold record." N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 396 (2009) (quoting E.P., 196 N.J. at 104).  A judge's purely legal decisions, however, are subject to our plenary review.  Crespo v. Crespo, 395 N.J. Super. 190, 194 (App. Div. 2007) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

We recognize parents have a constitutionally protected right to the care, custody and control of their children.  In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999).  But we also are mindful the constitutional right to the parental relationship is not absolute.  N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 553 (2014) (citing K.H.O., 161 N.J. at 347).  At times, a parent's interest must yield to the State's obligation to protect children from harm.  G.M., 198 N.J. at 397.

A termination of parental rights is not warranted unless the Division establishes the following prongs by clear and convincing evidence:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause

serious and enduring emotional or psychological harm to the child;

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a); see also K.H.O., 161 N.J. at 347-48.][5]

"The focus of a termination-of-parental-rights hearing is the best interests of the child." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 447 (2012) (citing N.J. Div. of Youth & Fam. Servs. v. R.D., 207 N.J. 88, 110 (2011)). The four statutory prongs "are neither discrete nor separate. They overlap to provide a composite picture of what may be necessary to advance the best interests of the children." N.J. Div. of Youth & Fam. Servs. v. M.M., 189

---

[5] The Legislature recently enacted L. 2021 c. 154 (eff. July 2, 2021), amending N.J.S.A. 30:4C-15.1(a)(2) to exclude from consideration the harm to children caused by removal from their resource parents. Accordingly, the second sentence of prong two has been eliminated. We are satisfied the Division proved all four prongs of the best interests standard under both the old and amended version of N.J.S.A. 30:4C-15.1(a). But because the trial in this matter occurred prior to the amendment, we are satisfied the amendment is not applicable to this appeal, for reasons we discuss below. See James v. N.J. Mfrs. Ins. Co., 216 N.J. 552, 563 (2014) (recognizing generally statutes should be applied prospectively).

N.J. 261, 280 (2007) (quoting <u>N.J. Div. of Youth & Fam. Servs. v. F.M.</u>, 375 N.J. Super. 235, 259 (App. Div. 2005)).

A.

Under the first prong, "the Division must prove harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'" <u>N.J. Div. of Youth & Fam. Servs. v. A.L.</u>, 213 N.J. 1, 25 (2013) (quoting <u>K.H.O.</u>, 161 N.J. at 352). The Division need not "wait 'until a child is actually irreparably impaired by parental inattention or neglect.'" <u>F.M.</u>, 211 N.J. at 449 (quoting <u>In re Guardianship of D.M.H.</u>, 161 N.J. 365, 383 (1999)).

Under prong two, "the inquiry centers on whether the parent is able to remove the danger facing the child." <u>F.M.</u>, 211 N.J. at 451 (citing <u>K.H.O.</u>, 161 N.J. at 352). This prong may be proven by "indications of parental dereliction and irresponsibility, such as the parent's continued or recurrent drug abuse, [and] the inability to provide a stable and protective home." <u>K.H.O.</u>, 161 N.J. at 353. "Prong two may also be satisfied if 'the child will suffer substantially from a lack of . . . a permanent placement . . . .'" <u>F.M.</u>, 211 N.J. at 451 (quoting <u>K.H.O.</u>, 161 N.J. at 363). Prongs one and two "are related to one another, and evidence that supports one informs and may support the other as part of the

comprehensive basis for determining the best interests of the child." D.M.H., 161 N.J. at 379.

Here, we agree with the judge the Division's evidence regarding prongs one and two was clear and convincing. Though Mark argues before us, as he did before the judge, that the Division should have assisted him in lifting his CSL restrictions by initiating a living with children evaluation, the record amply supports the judge's finding that Ria refused to sign the consent form required under N.J.A.C. 10A:72-2.5 and 10A:72-2.6 to permit Mark to reside with his children or have unsupervised contact with them. Therefore, we see no reason to second-guess the judge's conclusion it would have served no purpose for the Division to pursue its own living with children evaluation.

Similarly, it does not appear Mark would have been eligible for relief from his parole restrictions under N.J.S.A. 2C:43-6.4(c), given he had to prove by clear and convincing evidence that he posed no threat to the safety of others if released from parole supervision, and had not committed a crime for fifteen years since his last conviction or release from incarceration. Here, Mark was convicted multiple times after he was deemed a Megan's Law offender, as evidenced by his judgments of conviction from 2006, 2016, 2017, and 2018.

Mark also contends the judge mistakenly believed a Family Part judge could not address his parole restrictions. We agree, but that does not end our inquiry. As Mark points out, N.J.S.A. 9:2-4.1(a) provides, in part:

> Notwithstanding any provision of law to the contrary, a person convicted of sexual assault under N.J.S.[A.] 2C:14-2 shall not be awarded the custody of or visitation rights to any minor child, . . . except upon a showing by clear and convincing evidence that it is in the best interest of the child for custody or visitation rights to be awarded. However, a court that awards such custody or visitation rights to a person convicted of sexual assault under N.J.S.[A.] 2C:14-2 shall stay enforcement of the order or judgment for at least [ten] days . . . to permit the appeal of the order or judgment and application for a stay in accordance with the Rules of Court.

Although N.J.S.A. 9:2-4.1(a) allows a Family Part judge to award custody or parenting time rights to an individual convicted of sexual assault, the statute only permits a court to issue such an order if the movant shows by clear and convincing evidence this relief is in the child's best interest. Here, the record does not support Mark made such a showing. In fact, the record demonstrates he never applied for a hearing under N.J.S.A. 9:2-4.1(a). Further, he did not provide an evaluation to support the issuance of an order granting him unsupervised access to his children.

As discussed, the judge found Dr. Green's report and testimony flawed, albeit favorable to Mark in certain respects. Moreover, she found Dr. Green relied on inaccurate information from Mark when assessing Mark's risk to children. Because Mark never made any serious effort to obtain custody of his children, but instead, waited until summation to suggest the judge should relieve him from his parole restrictions under N.J.S.A. 9:2-4.1(a), and because the judge credited Dr. Jeffrey's assessment that Mark's ongoing contact with the children would be harmful to them, we perceive no reversible error in the judge's finding the Division satisfied its burden of proof under prong two of N.J.S.A. 30:4C-15.1(a).

B.

N.J.S.A. 30:4C-15.1(a)(3) requires the Division to make "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home[,]" and the court to "consider[] alternatives to termination of parental rights." A court's inquiry into the reasonableness of the Division's efforts also includes a consideration of "whether a parent actively participated in the reunification effort." N.J. Div. of Youth & Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 488 (App. Div. 2012) (citing D.M.H., 161 N.J. at 393). "Experience tells us that even [the

Division's] best efforts may not be sufficient to salvage a parental relationship," F.M., 211 N.J. at 452, and if the Division provides deficient services to a parent, reversal is not necessarily warranted, "because the best interests of the child controls" the ultimate determination, N.J. Div. of Youth & Fam. Servs. v. F.H., 389 N.J. Super. 576, 621 (App. Div. 2007).

Here, we concur with the judge's determination the Division provided defendants with myriad services, including psychological evaluations, anger management classes, therapy, therapeutic visits, and frequent phone contact between Ria and her children when she was incarcerated for well over a year. The record also shows the Division kept defendants routinely apprised of the children's needs and placements, their medical and behavioral problems, and recommendations for how to address those problems. Further, the Division provided the children with in-home therapy, mentors, therapeutic and behavioral services, sibling visits, and visits with their parents when possible. The point warrants no further discussion. R. 2:11-3(e)(1)(E).

The record also reflects the Division appropriately considered alternatives to termination. N.J.S.A. 30:4C-12.1(a) requires the Division, within thirty days of accepting a child into its custody, to initiate a search for relatives who may be willing and able to provide the care and support required by a child. It must

assess each interested relative and, if it finds the relative is unable or unwilling to care for the child, then the Division must provide reasons for that determination. N.J.S.A. 30:4C-12.1(a)-(b). Further, the Division's policy is "to place, whenever possible, children with relatives when those children are removed from the custody of their parents." N.J. Div. of Youth & Fam. Servs. v. K.F., 353 N.J. Super. 623, 636 (App. Div. 2002) (citing In re E.M.B., 348 N.J. Super. 31, 34 (App. Div. 2001)). The Division cannot ignore relatives "based upon an arbitrary, preordained preference for the foster placement" and "must perform a reasonable investigation of . . . relatives that is fair, but also sensitive to the passage of time and the child's critical need for finality and permanency." N.J. Div. of Youth & Fam. Servs. v. J.S., 433 N.J. Super. 69, 87 (App. Div. 2013).

Here, defendants argue the Division did not adequately explore alternatives to termination because Gail's assessment remained outstanding during the trial. We are not convinced.

As the judge acknowledged, the interstate process took longer than she would have liked, and the Division's efforts were "not perfect." But she credited Baptiste's testimony that the interstate process for Gail was "lengthy," and accepted the Division's representation it was working through the process to

have Gail become a viable option for the children.  Additionally, the judge believed Baptiste's statement that the children who did not need to be in treatment homes were not moved to Gail's home prior to trial because it would have further complicated the Division's efforts to coordinate sibling visits.  We perceive no abuse of discretion in this regard, particularly given Dr. Jeffrey's unrebutted expert testimony about the children's ongoing needs, and their pressing need for permanency, regardless of whether Gail's assessment was finished.

Regarding Mark's argument the Division acted unreasonably by adhering to ICPC procedures, because the ICPC does not apply to the placement of children with family members in other states, again, we are not persuaded.  Although Mark relies on K.F., 353 N.J. Super. at 623, in support of his contention, that case is distinguishable from the facts here.  In K.F., we addressed the court's ability to place children with an out-of-state relative but did not address the ICPC standards and the Division's obligations with respect to assessing and placing children with out-of-state relatives.  In that case, the trial court had terminated the Division's involvement with the family, the out-of-state relatives were maternal grandparents and had engaged in services with the Division, been deemed appropriate caretakers, and had filed for custody.

K.F., 353 N.J. Super. at 626.  But here, the Division remained involved with defendants and their children, sought to place the children with Gail, while monitoring the children's ongoing needs, and Gail never previously had custody of the children.  Moreover, N.J.S.A. 9:23-5, which codifies the ICPC for New Jersey, enumerates certain exceptions to the ICPC's application, and while grandparents and aunts are included, Gail's specific relation to the children—as a grandaunt—is not specified in the statute's plain language as an explicit exception.  Therefore, we conclude it was reasonable for the Division to adhere to the ICPC procedures when seeking to place the children with Gail.

Next, Ria and the Law Guardian contend the Division erred by failing to consider independent living for Sara, who turned fourteen during trial, and Julia, who was twelve at the time of trial, as an alternative to termination.  Yet Ria acknowledges the Division's policy manual allows independent living placements only for those children aged sixteen to twenty-one.  At trial, Jensen testified to this as well, stating independent living was not an option because the children had to be a minimum of sixteen years old.  Moreover, given Dr. Jeffrey's credible testimony about the children's dire need for permanency, we are satisfied the judge rightly chose not to delay permanency for any child until that child became eligible for independent living.

The Law Guardian next urges us to conclude the Division should have considered whether some of the children could have been reunified with Ria, rather than take an "all or nothing approach." Additionally, the Law Guardian and Mark argue the children's desire to live with Ria should have been considered by the judge and the Division. But the record is replete with evidence that it was in none of the children's best interests to return to their mother's care.

As Dr. Jeffrey noted in her testimony, Ria "was not prepared to provide a minimal level of safe parenting" and "[t]hat places the child[ren] at risk for harm." Ria provided no expert testimony to refute Dr. Jeffrey's conclusion. We further observe that while the judge and Division properly considered the children's feelings, the children's wishes could not be a deciding factor. See E.P., 196 N.J. at 113 (stating a "child's wishes should be but one factor" when determining whether terminating parental rights is in the child's best interests). Moreover, to the extent Sara and Julia testified before the judge about their wishes to return to Ria's care, the judge found their testimony seemed "coached," as the girls used the same unusual phrasing of wanting to return home with their "siblings."

In their reply briefs, defendants newly urge us to remand this matter so the judge may consider the recent amendments to the Kinship Legal

Guardianship Act, N.J.S.A. 3B:12A-1 to -7 (the Act), set forth in L. 2021, c. 154 (Amendments), and determine if a kinship legal guardianship (KLG) with Gail is appropriate. We decline this invitation.[6]

KLG is an alternative to termination of parental rights and allows a relative to become a child's legal guardian and commit to the child's care until adulthood, without stripping the parents of their rights. N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 508 (2004). In L. 2021, c. 154, the Legislature determined that "[k]inship care is the preferred resource for children who must be removed from their birth parents because use of kinship care maintains children's connections with their families," and there "are many benefits to placing children with relatives or other kinship caregivers . . . ." L. 2021, c. 154 § 1(b). Thus, the Legislature found it necessary "to amend current laws to strengthen support for kinship caregivers, and ensure focus on parents' fitness and the benefits of preserving the birth parent-child relationship, as opposed to

---

[6] Generally, we do not address arguments raised for the first time in reply briefs. See Pannucci v. Edgewood Park Senior Hous. — Phase 1, LLC, 465 N.J. Super. 403, 409-10 (App. Div. 2020) (citing State v. Smith, 55 N.J. 476, 488 (1970) (noting the impropriety of raising an argument for the first time in a reply brief)). But considering defendants' initial briefs were filed well before the Amendments were enacted, and for the sake of completeness, we address defendants' new contentions.

considering the impact of severing the child's relationship with the resource family parents." L. 2021, c. 154 § 1(g). Accordingly, effective July 2, 2021, over a year after the trial here, L. 2021, c. 154 amended portions of the Act and the statutes addressing abuse or neglect and termination to reflect the goal of encouraging placement with relatives or kinship guardians.

The amended Act shortens the amount of time a child needs to reside in the home of a relative or family friend for that person to be considered a "caregiver" eligible to become a kinship legal guardian. N.J.S.A. 3B:12A-2; N.J.S.A. 3B:12A-5. Further, the Amendments eliminate the requirement from N.J.S.A. 3B:12A-6(d)(3) that "adoption of the child is neither feasible nor likely" for a KLG to be appointed. L. 2021, c. 154 § 4.

Additionally, N.J.S.A. 9:6-8.30, -8.31, and -8.54 now require that, in abuse or neglect cases, the Division shall first consider and make reasonable efforts to place a child "with a suitable relative or person who has a kinship relationship," before placing the child with another suitable person. Regarding the statutes addressing termination, L. 2021, c. 154 amended N.J.S.A. 30:4C-12.1(a) to require the Division to "consider placement of the child with a suitable relative or person who has a kinship relationship," and to "initiate a search for

relatives or persons with a kinship relationship with the child" in termination cases.

Notwithstanding these substantive Amendments, we are not convinced a remand is warranted. Instead, we are satisfied the purpose of the Amendments is being fulfilled in this matter because the Division already implemented a plan to pursue Gail as a potential relative placement. In fact, the record reflects the Division continuously worked with Gail to facilitate her being licensed to care for the children. Aware of the Division's efforts to pursue interstate placement, the judge still credited Dr. Jeffrey's testimony that the children needed permanency and a delay in permanency would cause further harm. Thus, no remand is required.

We also are not convinced the Amendments should be applied retroactively. In general, the rule of statutory construction favors a prospective application of statutes, but that rule should not be applied mechanically in defeating a retroactive application of a statute. In re Guardianship of B.L.A., 332 N.J. Super. 392, 400 (Ch. Div. 2000) (citing Phillips v. Curiale, 128 N.J. 608, 615 (1992)). A court's determination that a statute is retroactive depends on the objectives of the legislation and the "common sense of the situation." Id. at 402-03 (citing State v. Volpini, 291 N.J. Super. 401, 408 (App. Div. 1996)).

61

Thus, we examine the legislative intent considering the language used and the objectives to be achieved. State v. Smith, 279 N.J. Super. 131 (App. Div. 1995).

According to our Supreme Court in Gibbons v. Gibbons, 86 N.J. 515, 522-23 (1981), there are three exceptions to the presumption in favor of a prospective application of a statute. Specifically:

> (1) the Legislature provided for retroactivity expressly, either in the language of the statute itself or its legislative history, or implicitly by requiring retroactive effect to "make the statute workable or to give it the most sensible interpretation"; (2) "the statute is ameliorative or curative"; or (3) the parties' expectations warrant retroactive application.
>
> [State v. J.V., 242 N.J. 432, 444 (2020) (quoting Gibbons, 86 N.J. at 522-23).]

Ameliorative statutes refer to criminal laws that effect a reduction in a criminal penalty. Perry v. N.J. State Parole Bd., 459 N.J. Super. 186, 196 (App. Div. 2019). Curative statutes refer to acts or amendments to correct an error in the original enactment of a statute. Street v. Universal Mar., 300 N.J. Super. 578, 582 (App. Div. 1997). Curative statutes can be applied retroactively if an amendment carries out the original intent of the statute but does not change the intended scope or purpose of the underlying original statute. Ibid. Governed by these principles, we conclude the Amendments are neither ameliorative nor curative.

A-3037-19

Regarding the first and third exceptions articulated by the <u>Gibbons</u> Court, we observe the Amendments do not expressly provide for retroactive application. Still, we recognize their purpose is not only to protect children, but to protect and preserve parental rights by maintaining familial connections. <u>L.</u> 2021, <u>c.</u> 154, § 1. Thus, there is some reason to conclude the Amendments should apply retroactively.

However, there are more aspects to the Amendments that lead us to conclude their application should not be retroactive. For example, the Legislature provided no guidance on how to implement a retroactive application of the Amendments, an important factor, as such an action would require re-evaluating and re-assessing a multitude of Division matters to determine if a party could now qualify as a kinship caregiver, if such a role previously was not available. Also, retroactive application of the Amendments would require a reassessment of whether KLG petitions should be reconsidered, given the removal of the requirement that adoption be neither feasible nor likely. This is no small undertaking. Given these hurdles, the most common-sense application of the Amendments suggests the Legislature intended the application to be prospective only. What is more, the Amendments are the most "workable" when given the sensible interpretation they are prospective.

There are also other aspects of the Amendments, such as those pertaining to KLG definitions and timeframes, see, e.g., N.J.S.A. 30:4C-12.1(a), that support a prospective application of the Amendments. Specifically, there were instances where the Legislature could have adjusted timeframes to coincide with a retroactive reading of the statute but chose not to make such changes. For example, in N.J.S.A. 30:4C-12.1(a), the Legislature made changes to what the Division must do regarding the search for a person interested in KLG but did not adjust the timeframes and requirements for when the Division initiates its search.

Finally, we are not satisfied the parties' expectations warrant a retroactive application, particularly since there is no guidance in the Amendments to assist the Division in applying the changes retroactively in terms of timing or methodology. Also, the Legislature noted the Amendments would take effect immediately. In Pisack v. B & C Towing, Inc., 240 N.J. 360, 370 (2020), the Court explained that statutes that have an immediate or future effective date demonstrate the Legislature sought prospective application only. Significantly, the Pisack decision was released by the Court prior to the enactment of the Amendments. A court may presume the Legislature was aware of how the court would interpret its statutes. N.J. Democratic Party, Inc. v. Samson, 175 N.J.

178, 195 n.6 (2002).  Further, when the Legislature is silent on the matter of retroactivity, it is a signal to the judiciary that it intended a prospective application of a statute or amendment.  Olkusz v. Brown, 401 N.J. Super. 496, 502 (App. Div. 2008).

We also are not persuaded pipeline retroactivity applies to the Amendments.  Pipeline retroactivity allows for the retroactive application of a new law to a case in the direct appeal process when the new law became effective.  State v. G.E.P., 243 N.J. 362, 370 (2020).  In James, our Court again emphasized the importance of legislative intent on the application of retroactivity.  216 N.J. at 568.  If the Legislature intended a retroactive application of the Amendments for pending direct appeals, there would be evidence in the Legislative history, and a statement of intention made plain in the section that stated when the law would become effective.  There might also be support in the sponsor's statement.  But here, there are no indications pipeline retroactivity was intended or the Legislature wanted retroactivity for certain matters, such as pending direct appeals.  For these reasons, we are satisfied the statutory construction of the Amendments favors only a prospective application.

## C.

The fourth prong of the statute requires the court to determine that termination "will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). It serves as a "'fail-safe' inquiry guarding against an inappropriate or premature termination of parental rights." F.M., 211 N.J. at 453 (quoting N.J. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 609 (2007)).

Here, defendants and the Law Guardian argue the judge erred in finding the Division proved the fourth prong because there was no "compensating benefit." Also, they contend her finding the children were adoptable was unsupported. Again, we disagree.

"The question ultimately is not whether a biological mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with th[e] parent." E.P., 196 N.J. at 108. "A decision to terminate parental rights should not simply extinguish an unsuccessful parent-child relationship without making provision for . . . a more promising relationship . . . [in] the child's future." Ibid. (alterations in original) (quoting N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 610 (1986)). But it also is well established that a "child deeply needs association with a nurturing adult" and that "permanence in itself is an important part of that

nurture." Ibid. (quoting A.W., 103 N.J. at 610). "Ultimately, a child has a right to live in a stable, nurturing environment and to have the psychological security that his [or her] most deeply formed attachments will not be shattered." F.M., 211 N.J. at 453. Accordingly, the fourth prong may be satisfied where the "termination action was not predicated upon bonding, but rather reflected [the child's] need for permanency and [the parents'] inability to care for [the child] in the foreseeable future." N.J. Div. of Youth & Fam. Servs. v. B.G.S., 291 N.J. Super. 582, 593-94 (App. Div. 1996).

Here, although the children exhibited certain behavioral problems and there was no set plan for adoption, the record amply demonstrates the Division was working with ICPC to place the children with Gail. Further, Jensen credibly testified the Division identified multiple potential adoptive homes located in the New Jersey database for each child. The judge also credited Baptiste's statement that the children were adoptable. Moreover, while the children had "affectionate ties" to their parents, the judge accepted Dr. Jeffrey's resolute opinion that the children had "insecure attachments" to their parents, defendants were not attuned to their children's needs, and neither Ria nor Mark could provide a "minimal level of safe parenting," thereby placing the children "at risk for harm." Significantly, the judge also credited Dr. Jeffrey's opinion that severance

of an insecure attachment "does not create severe and enduring harm." Given these facts, we are satisfied the evidence amply supports the judge's finding the Division satisfied its burden on the fourth statutory prong.

In sum, we affirm the termination of defendants' parental rights mostly for the reasons expressed by the trial judge in her comprehensive opinion. To the extent we have not addressed defendants' or the Law Guardian's remaining arguments, we are satisfied they lack sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3037-19